UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

------------------------------------------------------
                                          :
JOHN O'DONNELL,                           :
                                          :
                Plaintiff,                :          CASE NO. 1:14-CV-01767
                                          :
vs.                                       :          OPINION & ORDER
                                          :          [Resolving Docs. 45, 56, 57]
GENZYME CORP. ET AL.,                     :
                                          :
                Defendants.               :
                                          :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiff John O'Donnell brings employment related claims against Defendant Genzyme Corp. ("Genzyme").[1] He alleges that Genzyme constructively discharged him in violation of several public policies. Plaintiff O'Donnell says Genzyme constructively fired him because he opposed the promotion of off-label use of medical devices, opposed gender discrimination, and because he consulted an attorney about these issues. O'Donnell also alleges that Genzyme retaliated against him for opposing gender discrimination.

Genzyme has filed a motion for summary judgment on all claims.[2] O'Donnell opposes the motion.[3] Genzyme has also filed a motion to strike some or all of certain filings made by Plaintiff

---

[1]The parties dispute whether the additional Defendant referred to by Plaintiff O'Donnell as "Sanofi U.S. a/k/a Sanofi-Adventis and Sanofi-Biosurgery" is a proper party to this action for events after Genzyme became a wholly owned subsidiary of Sanofi SA. Given the Court's conclusion that summary judgment is appropriate on all claims, the Court need not address this issue. For simplicity, the Court refers simply to "Genzyme" throughout this order.

[2]Doc. 45.

[3]Doc. 53.

-1-

Case No. 1:14-CV-01767
Gwin, J.

O'Donnell.[4]

For the reasons below, the Court **GRANTS** Defendant Genzyme's motion for summary judgment on all counts of Plaintiff O'Donnell's amended complaint, **GRANTS** Genzyme's motion to strike certain attorney-client privileged communications and **DENIES AS MOOT** the remainder of Genzyme's motion to strike and Plaintiff O'Donnell's motion for leave to amend various declarations.

## I. Background

## A. General Background and Opposition to Off-Label Promotion

In 1999, Defendant Genzyme promoted Plaintiff John O'Donnell from Territory Manager to Regional Sales Manager.[5]  Among other responsibilities for this position, O'Donnell sold or supervised the sale of Seprafilm, a medical device the FDA has approved for use in open abdominal and pelvic surgeries.

O'Donnell alleges that Defendant Genzyme's sales of Seprafilm declined rapidly beginning around 2004, after doctors began using laparascopic techniques for colon cancer surgery.[6]  Against these declining Seprafilm sales, Plaintiff O'Donnell says Genzyme sales representatives responded by marketing the product for an unapproved use in "slurry," a mixture containing Seprafilm that can be used for laparascopic surgeries.[7]  Using Seprafilm in slurry is "off-label"; it is not approved by the FDA.[8]

---

[4]Doc. 56.  O'Donnell has responded to this motion, *see* Doc. 58, and Defendant Genzyme has replied, *see* Doc. 59.  O'Donnell has also filed a motion for leave to amend various declarations.  *See* Doc. 57.

[5]*See* Doc. 45-4 at 31.

[6]Doc. 53-3 at 1.

[7]*See, e.g.*, Doc. 45-4 at 87-88.

[8]*Id.* at 86.

Case No. 1:14-CV-01767
Gwin, J.

Beginning in 2006, Plaintiff O'Donnell says he opposed the promotion of off-label use by refusing to participate in it, by telling sales representatives that they should not participate in marketing off-label use, by reporting it to Genzyme's Executive Vice President and other high ranking company officials, and by voicing concerns about it at sales leadership meetings.[9] O'Donnell says that Defendant Genzyme responded to his opposition to off-label promotion of Seprafilm by retaliating in a variety of ways.  Unsurprisingly, Genzyme does not agree.

Plaintiff O'Donnell first says that he was belittled and made fun of for his opposition to off-label promotion.  For example, he says that his supervisors told him he was not a team player and referred to him as "Chicken Little," which he interpreted as a reference to his opposition to off-label promotion.[10]  Responding, Genzyme points out that Plaintiff O'Donnell's performance evaluations were positive, including references to him as "the ultimate team player"[11] and "a great team player."[12]

O'Donnell also says that his performance evaluations were downgraded in retaliation for opposing off-label promotion.  From 2003 to 2005, O'Donnell's performance evaluations concluded that he "exceeds expectations."[13]  O'Donnell's 2006 evaluation rated him "distinguished," a higher rating than "exceeds expectations."[14]   In 2007, O'Donnell's evaluation concluded that he "successfully meets expectations."[15]   In 2008, O'Donnell's evaluation again concluded that he

---

[9]Docs. 45-4 at 86, 265, 53-4 at 2, 53-6 at 121, 124.

[10]Doc. 45-4 at 98-100.

[11]Doc. 45-6 at 5.

[12]Doc. 45-7 at 5-6.

[13]Doc. 53-7 at 11, 16, 22.

[14]*Id.* at 30.

[15]*Id.* at 40.

Case No. 1:14-CV-01767
Gwin, J.

"exceeds expectations,"[16] and from 2009 to 2011, O'Donnell's evaluations concluded that he "successfully meets expectations."[17] In some, but not all, of the years covered by these performance evaluations, O'Donnell met his sales quota.[18]

Further, O'Donnell says that he was passed over for or denied the chance to apply for promotions to Area Director, the position immediately above Regional Sales Director. O'Donnell points to four occasions when he believes he should have been promoted. Instead, O'Donnell claims that Genzyme promoted individuals who tolerated, encouraged, or engaged in off-label promotion.[19]

First, O'Donnell says that in 2007, Genzyme promoted Jim Traa to an opening that O'Donnell was never told about or given the opportunity to apply for.[20] Although O'Donnell believed that he would have been a better candidate, O'Donnell acknowledges that Traa was qualified for the position.[21]

Next, in 2009, Genzyme demoted Traa and split Traa's responsibilities into two positions. O'Donnell says he was never informed of either opening, and the jobs went to Howard Thorpe and Devin Hughes.[22] O'Donnell believes that Thorpe was qualified,[23] but that Hughes was not.[24] Joe Brennan, an executive who hired Hughes, acknowledged that there had been investigations into prior

---

[16]*Id.* at 50.

[17]*Id.* at 59, 71, 81.

[18]*Compare, e.g., id.* at 24 (exceeding quota in 2006), *with, e.g., id.* at 65 (falling short of quota in 2010).

[19]*See, e.g.*, Doc. 53-8 at 2.

[20]Doc. 45-4 at 126-29.

[21]*Id.* at 135.

[22]*Id.* at 142.

[23]O'Donnell does allege that Thorpe sent an email relating to off-label promotion, but the email O'Donnell points to contains no such reference. Indeed, the cited email was sent to Thorpe, not by him. *See* Doc. 53-15.

[24]Doc. 45-4 at 143.

Case No. 1:14-CV-01767
Gwin, J.

off-label promotion by Hughes and those under his supervision.[25/]  Brennan also expressed concerns about "some credibility issues" with Hughes.[26/]

In 2011, O'Donnell did not apply for a posted job opening for Area Director because he believed doing so would be futile.[27/]  The position eventually went to Joe Caruso, who O'Donnell did not believe was qualified because Caruso had been with the company for less than a year.[28/]

Finally, in April 2012, Joe Caruso left the company voluntarily, and Genzyme promoted Dawn Gillespie to replace Caruso.[29/]  O'Donnell concedes he did not apply for the position or otherwise indicate his interest in it, but says he did not know about the posting for it.[30/]

O'Donnell says that in 2009, Genzyme began taking stronger measures to ensure compliance with FDA regulations.[31/]  Specifically, O'Donnell noted presentations at a sales meeting titled "Above the Line in '09."[32/]  O'Donnell interpreted this slogan to mean "that there were a lot of people who were operating below the line and that everybody needed to come up and operate above the line, sell the product on-label."[33/]  The meeting, O'Donnell said, was "an admission that everything we'd been doing was wrong and we got to change it."[34/]

Plaintiff O'Donnell felt that Defendant Genzyme's new management unfairly criticized the

---

[25]Doc. 53-6 at 136.  O'Donnell is mistaken, however, in relying on an advertisement featuring Hughes as evidence that Hughes promoted off-label.  *See* Doc. 53 at 17-18.  The advertisement refers to "abdominal or pelvic laparotom[ies]."  Doc. 53-16.  A laparotomy is not the same as a laparoscopic procedure.  Rather, a laparotomy is a traditional, open surgery that the FDA has approved Seprafilm for use in.

[26]Doc. 45-4 at 136.

[27]*Id.* at 146-47.

[28]*Id.* at 146.

[29]*Id.* at 149.

[30]*Id.* at 150-52.

[31]*Id.* at 265.

[32]*Id.*

[33]*Id.* at 265-66.

[34]*Id.* at 266.

Case No. 1:14-CV-01767
Gwin, J.

sales force at a 2011 quarterly sales leadership meeting.  Specifically, O'Donnell says that before

meeting any members of the sales force, Joe Balzer referred to the sales force as selfish, greedy, self-

centered, and willing to promote off-label in order to make money for themselves.[35]  The comment

stands at odds with O'Donnell's argument that he was disadvantaged because he, like Balzer, spoke

against off-label use of Seprafilm.  O'Donnell says that the portion of Balzer's comments related to

off-label promotion did not bother him, but that the other characterizations did.[36]  O'Donnell

believed that the majority of the sales force was not engaging in off-label promotion at that point.[37]

Also at this 2011 meeting, O'Donnell attended a presentation given by manager Rick Ramos.

O'Donnell says that during this presentation, Ramos showed a chart of the top earning sales

representatives and commented that the top three performing representatives–all of whom were

female–were making too much money.[38]

In response to the events at this meeting, Plaintiff O'Donnell went to his supervisor, Joe

Caruso, and attempted to resign.[39]  Caruso asked O'Donnell not to resign and asked O'Donnell to

stay for the good of his team.[40]  O'Donnell subsequently met with Caruso, Ramos, and Betty Lenes,

a Human Resources Business Partner, all of whom asked O'Donnell to stay.[41]  O'Donnell felt that

the requests that he stay, including from Caruso and Ramos–the two people directly above him in

---

[35]*Id.* at 159-60.

[36]*Id.* at 167.

[37]*Id.*

[38]*Id.* at 45-46, 169-70.  Ramos did not mention or otherwise reference the fact that these three sales
representatives were all female.  *Id.* at 46.

[39]*Id.* at 171.

[40]*Id.* at 172.

[41]*Id.* at 174.

Case No. 1:14-CV-01767
Gwin, J.

the company–were sincere, and he agreed not to resign.[42/]

## B. Termination of Kristin Kepreos

The next incident Plaintiff O'Donnell uses is Genzyme's firing of Kristin Kepreos, a sales representative whom O'Donnell supervised.  On June 4, 2012, Betty Lenes and Howard Thorpe notified O'Donnell that a decision had been made to fire Kepreos, and that, as Kepreos's supervisor, O'Donnell was expected to participate in the conference call notifying Kepreos of her termination.[43/] Genzyme says it fired Kepreos because she admitted to falsifying three expense reports and violated both company compliance requirements and the Code of Ethics of the Advanced Medical Technology Association by paying for physician meals without an educational component and by paying for physician meals when Kepreos had not even been present.

O'Donnell says that a day or two later, before Kepreos was terminated, he told Lenes and Thorpe that he would not participate in the termination because he believed firing Kepreos was illegal gender discrimination.[44/]  Defendant Genzyme says that O'Donnell advised Lenes of his refusal only ten minutes before the scheduled conference call, and that O'Donnell had avoided talking to Lenes earlier in the day.[45/]

O'Donnell says that Lenes and Thorpe told him that Genzyme was terminating Kepreos for "compliance violations" but would not elaborate.[46/]  Defendant Genzyme counters that the morning of the scheduled call with Kepreos, June 5, 2012, O'Donnell received a copy of "talking points" that

---

[42]*Id.* at 175-76.
[43]Doc. 45-4 at 37.
[44]*Id.* at 38-40.
[45]Doc. 45-10.
[46]Doc. 45-4 at 40-42.

Case No. 1:14-CV-01767
Gwin, J.

included detail regarding the alleged compliance violations.[47/]  O'Donnell did not read these talking

points.[48/]  Had O'Donnell read the talking points, he would have learned that Kepreos had admitted

to falsifying the expense reports that violated compliance procedures.[49/]

On June 11, 2012, approximately a week later, O'Donnell sent an email to Lenes and Thorpe

in which he indicated his desire to "discuss how [Kepreos] was treated recently and whether or not

she was singled out and potentially discriminated against."[50/]

At around the same time O'Donnell sent the email to Lenes and Thorpe, he participated in

a scheduled conference call during which he was notified that he was receiving a Final Written

Warning.[51/]  This Final Written Warning reprimanded him for "Failure to Properly Follow and

Enforce Company Compliance Policies" and "Failure to Fulfill Essential Managerial Duties,

Responsibilities and Expectations."[52/]  In the Warning, Defendant Genzyme focused on the manner

in which O'Donnell refused to terminate Kepreos rather than on his refusal to participate.[53/]

The Final Written Warning also cautioned O'Donnell that "[i]f at any point in the future you

violate company conduct, behavior, or expectations, you will face additional disciplinary action, up

to and including termination."[54/]  It further notified him that he was "'not in good standing' as an

employee of the company."[55/]  According to Rick Ramos, this meant that O'Donnell could not seek

internal promotions or transfers for one year, but the warning would not affect O'Donnell's

---

[47]*See id.* at 202-13; Doc. 45-10.
[48]Doc. 45-4 at 214-15.
[49]*See* Doc. 45-10.
[50]Doc. 54-1 at 1-2.
[51]Doc. 54-1 at 1.
[52]Doc. 45-9 at 1-2.
[53]*Id.*
[54]*Id.* at 3.
[55]*Id.*

Case No. 1:14-CV-01767
Gwin, J.

"compensation or continued employment status."[56]

After the conference call, O'Donnell received an email communicating the Final Written Warning from Howard Thorpe, his direct supervisor, with copies to Betty Lenes, from Human Resources, and Rick Ramos, Thorpe's supervisor.[57]  Defendant Genzyme contends that the decision to issue the Final Written Warning was made solely by Ramos, and that Thorpe served merely as a conduit.[58]  Genzyme further says that Ramos was unaware that O'Donnell had opposed Kepreos's termination on gender discrimination grounds or that O'Donnell had contacted an attorney for legal advice on the matter.[59]

O'Donnell does not say he was disciplined or threatened with termination between the time he received the Final Written Warning and the time he quit his employment in October 2012, several months later.[60]

## C. The 2013 Sales Quota

Finally, in Fall of 2012, O'Donnell attended a quarterly sales meeting in Orlando, Florida. At that meeting, the company announced that the company-wide quota for Seprafilm sales would increase in 2013 from below $100 million to $138 million.[61]  O'Donnell says that he and other Regional Sales Directors at the meeting understood this increase to encourage off-label promotion.[62]

---

[56]Doc. 45-13 at 2-3.  There is no evidence that any Area Director positions became open between June 2012, when O'Donnell received the Final Written Warning, and October 2012, when O'Donnell quit.  *See*  Doc. 45-4 at 152-53.

[57]Doc. 53-10 at 1.  The Final Written Warning lists Thorpe and Lenes in the "From" field and Ramos in the "Cc" field.  *Id.* at 2.

[58]Doc. 45-13 at 2.

[59]*Id.*

[60]Doc. 45-4 at 27

[61]Doc. 45-4 at 11, 19-20.

[62]*Id.* at 11.

Case No. 1:14-CV-01767
Gwin, J.

The increase applied proportionally to all units selling Seprafilm.[63/]  O'Donnell received the same

sales target increase that other Regional Sales Directors received.

While still at the meeting, O'Donnell asked Area Director Dawn Gillespie how the new quota

had been determined.[64/]  Although O'Donnell does not remember Gillespie's response, he does

remember that she did not indicate that the quota included a projection of sales from off-label

promotion.[65/]  O'Donnell also discussed the matter with Howard Thorpe, who O'Donnell remembers

smiling and saying "it is what it is."[66/]  Defendant Genzyme says that the quota increase of roughly

40% reflected a planned 70% increase in the sales force–40 new "sales professionals"–and the

introduction of a new type of contract that would allow sales to more customers.[67/]

O'Donnell does not remember further raising the issue of sales target increases with

management during the several week period between the Orlando meeting and when his employment

ended.[68/]

On October 30, 2012, O'Donnell resigned in what he says was a constructive discharge.[69/]

## II. Law and Analysis

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when 'there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[70/]

---

[63]*Id.* at 16-17; *see* Doc. 45-13 at 3.
[64]Doc. 45-4 at 30.
[65]*Id.* at 31.
[66]*Id.* at 32.
[67]Doc. 45-13 at 3.
[68]Doc. 45-4 at 33-34.
[69]Doc. 53 at 8.
[70]*Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 580 (6th Cir. 2014) (quoting Fed. R. Civ. Pro. 56(a)).

Case No. 1:14-CV-01767
Gwin, J.

The moving party must first demonstrate that there is an absence of a genuine dispute as to a material fact entitling it to judgment.[71/]  Once the moving party has done so, the non-moving party must set forth specific facts in the record—not its allegations or denials in pleadings—showing a triable issue.[72/]  The existence of some doubt as to the material facts is insufficient to defeat a motion for summary judgment.[73/]  But the Court views the facts and all reasonable inferences from those facts in favor of the non-moving party.[74/]

## B. Wrongful Discharge in Violation of Public Policy

Under Ohio law, an employer may generally fire an at-will employee for any reason at any time.  However, Ohio recognizes an exception to the at-will doctrine for wrongful discharge in violation of public policy, commonly known as a *Greeley* claim.[75/]

To state a *Greeley* claim, a plaintiff must show that: (1) a "clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element)"; (2) "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element)"; (3) the plaintiff's "dismissal was motivated by conduct related to the public policy (the *causation* element)"; and (4) the plaintiff's employer "lacked overriding legitimate business justification for the dismissal (the *overriding justification* element)."[76/]

The clarity and jeopardy elements of a *Greeley* claim are questions of law for a court's

---

[71]*See* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
[72]*See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
[73]*Id.* at 586.
[74]*Killion*, 761 F.3d at 580. (internal citation omitted).
[75]Greeley v. Miami Valley Maint. Contractors, 551 N.E.2d 981 (Ohio 1990).
[76]Dohme v. Eurand Am., Inc., 956 N.E.2d 825, 829 (Ohio 2011) (internal quotation marks and citations omitted).

Case No. 1:14-CV-01767
Gwin, J.

determination, while the causation and overriding justification elements are questions of fact for the fact finder.[77]

"[T]o satisfy the clarity element, . . . a terminated employee must articulate a clear public policy by citation of specific provisions in the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law."[78]  The plaintiff has the burden of identifying the source of the public policy, and "a court may not presume to sua sponte identify the source of that policy."[79]

Courts use a three-step process to assess the jeopardy element.  They first ask "what kind of conduct is necessary to further the public policy at issue."[80]  Second, they determine whether "the employee's actual conduct fell within the scope of conduct protected."[81]  And third, they "consider whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal."[82]

To establish a *Greeley* claim, a plaintiff must demonstrate that he was discharged.  Other forms of retaliation, such as nonpromotion, do not suffice.[83]  Constructive discharges, however, are actionable under the *Greeley* framework.[84]

Under Ohio law, a constructive discharge occurs when "the employer's actions made working

---

[77]*Id.*

[78]*Id.* at 831.

[79]*Id.*

[80]*Avery v. Joint Twp. Dist. Mem'l Hosp.*, 286 F. App'x 256, 264 (6th Cir. 2008) (quoting *Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (6th Cir. 2003)).

[81]*Id.* (quoting *Himmel*, 342 F.3d at 599).

[82]*Id.* (quoting *Himmel*, 342 F.3d at 599).

[83]*Evans v. Toys "R" Us-Ohio, Inc.*, 32 F. Supp. 2d 974, 990 (N.D. Ohio 1999), *aff'd*, 2000 WL 761803 (6th Cir. 2000); *see Cummings v. Greater Cleveland Reg'l Transit Auth.*, ___ F. Supp. 3d ___, 2015 WL 410867, at *3 (N.D. Ohio Jan. 29, 2015).

[84]*See Collins v. Rizkana*, 652 N.E.2d 653 (Ohio 1995).

Case No. 1:14-CV-01767
Gwin, J.

conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign."[85]  Moreover, "[i]n applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent."[86]  "[P]art of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast."[87]  To be actionable, a constructive discharge must relate to the alleged violation of public policy.[88]

Although no single factor is determinative, the Ohio Supreme Court has recognized a "myriad of factors" that may be relevant.[89]  These include "reductions in sales territory, poor performance evaluations, criticism in front of coemployees, inquiries about retirement intentions, and expressions of a preference for employees outside the protected group."[90]

It is this last requirement–that the plaintiff was discharged either actually or constructively– that is fatal to Plaintiff O'Donnell's *Greeley* claims.  Although O'Donnell points to several features of his employment that he says support a finding of constructive discharge, no reasonable jury could conclude that, alone or together, these factors would have compelled a reasonable employee to resign.  Likewise, no reasonable jury could conclude that a reasonable employee in O'Donnell's position would have believed that termination was imminent.

To begin, the Court notes that the background allegations of nonpromotion and a hostile

---

[85]*Mauzy v. Kelly Servs., Inc.*, 664 N.E.2d 1272, 1280-81 (Ohio 1996) (internal citations omitted).

[86]*Id.* at 1281.

[87]*Mayo v. Kenwood Country Club, Inc.*, 731 N.E.2d 190, 194 (Ohio Ct. App. 1999) (alteration in original) (internal quotation marks and citation omitted).

[88]*Cf. Kemper v. Springfield Twp.*, 2012 Ohio 2461 (Ohio Ct. App. 2012) (reaching a similar conclusion in considering a constructive discharge claim in the FMLA context).

[89]*Mauzy*, 664 N.E.2d at 1281.

[90]*Id.*

-13-

Case No. 1:14-CV-01767
Gwin, J.

environment do little to support O'Donnell's claim that he was constructively discharged.  Even assuming the accuracy of O'Donnell's perception that applying for the promotions would have been futile, the last instance of nonpromotion occurred several months before his resignation.

And any generalized belittling or making fun of O'Donnell appears to have been concentrated before 2009.  O'Donnell admits that in 2009, Defendant Genzyme increased its efforts to crack down on off-label promotion.  At the very least, O'Donnell has put forward no evidence that the general environment was more intolerable near the time of his discharge than the environment during the several years he says he was opposing off-label promotion before Genzyme made clear that the practice was forbidden in 2009.

In considering O'Donnell's argument that Defendant Genzyme would inevitably fire him, the Court notes that when O'Donnell attempted to resign in 2011–five years after O'Donnell began complaining that off-label marketing of Seprafilm was improper–two direct supervisors persuaded him to stay.  O'Donnell believed these supervisors were sincere in their attempt to change his mind about resigning.[91]  By O'Donnell's own account, these supervisors intervened to avoid O'Donnell's resignation at a time O'Donnell had been vocally opposing off-label Seprafilm promotion for approximately five years.

By itself, this does not defeat O'Donnell's constructive discharge claim, but it undercuts whether a reasonable jury could conclude that the general atmosphere was so intolerable that a reasonable employee would feel compelled to resign.

Having considered Plaintiff O'Donnell's general claims regarding nonpromotion and the environment, the Court now turns to two more specific and recent actions that O'Donnell says

---

[91]Doc. 45-4 at 175-76.

-14-

Case No. 1:14-CV-01767
Gwin, J.

compelled him to resign: the June 2012 Final Written Warning and the new sales quota announced in Fall 2012 for the 2013 year.

O'Donnell's argument that the Final Written Warning led to a constructive discharge suffers from the same problem as his nonpromotion and generalized environment arguments.  In particular, Plaintiff O'Donnell worked for a significant amount of time–approximately four and a half months–after receiving the Final Written Warning, apparently without incident.[92]  During this time, O'Donnell's salary and responsibilities remained the same, and no Area Director positions became available.

Having lived with the Warning for four months without any apparent effect, O'Donnell makes the unpersuasive claim that the Warning suddenly caused intolerable conditions.  No reasonably jury could accept this argument.

Plaintiff O'Donnell's reliance on the 2013 sales guidance fares no better.  O'Donnell says that the 2013 sales guidance set a target that could only be reached by promoting off-label. O'Donnell claims that by setting such a high target, Genzyme was effectively firing him.  O'Donnell contends, and Genzyme does not appear to dispute, that the relevant 2013 sales goal was 40% higher than it had been in any prior year.

But Defendant Genzyme gave uniform sales quota increases across the board to all sales directors and Genzyme did not give different increases to any region, including O'Donnell's. Accepting O'Donnell's theory would thus suggest that Genzyme's new quota constructively discharged its entire sales force.  Additionally, Genzyme offers evidence that the increased quota was based on several factors including a planned 70% increase of the sales force and the initiation of new

---

[92]*Id.* at 27.

-15-

Case No. 1:14-CV-01767
Gwin, J.

contracts that would allow for sales to new customers, and that the quota was specifically designed to not require off-label promotion.[93]  Since Regional Sales Directors' quotas reflect the sales of their teams, the planned 70% increase in the sales force, combined with other changes that provided access to new customers, could be expected to justify higher quotas.

Importantly, Plaintiff O'Donnell made only minimal efforts to confirm his suspicion that attempting to meet the new sales quota without off-label promotion would result in failure and the loss of his job.  In particular, O'Donnell asked Area Director Dawn Gillespie how the new quotas were determined.  She responded that off-label promotion would not be required.[94]

O'Donnell did not further raise the issue with management, but instead waited several weeks and then resigned.  O'Donnell's argument that the changed sales quota constructively discharged him fails in two ways.[95]  First, against the backdrop of large sales force increases and large customer increases, the higher sales quota does not establish that Genzyme intended to encourage or require off-label promotion.

Second, O'Donnell does not offer evidence that failing to meet the new quota would lead to termination.  To the contrary, evidence shows that failing to meet one's quota did not automatically result in dismissal.  O'Donnell himself had previously missed his sales quota and not been terminated.  Indeed, although O'Donnell missed his quota in 2010,[96] in 2011 his supervisors not only did not try to force him out, but sincerely and successfully talked him out of resigning.

Finally, the nonexhaustive factors listed by the Ohio Supreme Court's constructive discharge

---

[93]Doc. 45-13 at 3-4.

[94]Likewise, the response from Howard Thorpe, another area director was simply "It is what it is."

[95]See *Mayo v. Kenwood Country Club, Inc.*, 731 N.E.2d 190, 194 (Ohio Ct. App. 1999) (alteration in original) (internal quotation marks and citation omitted).

[96]Doc. 53-7 at 65.

-16-

Case No. 1:14-CV-01767
Gwin, J.

case law do not support a finding of constructive discharge.[97]  Plaintiff O'Donnell's sales territory

was not decreased, he did not received failing performance evaluations,[98] there were no inquiries as

to his retirement intentions, and he has not put forward evidence that he was criticized in front of

coemployees in the time shortly before his discharge.  Furthermore, Genzyme had expressed no

preference for employees outside the protected group–in fact O'Donnell conceded that nobody

serving Genzyme in a management position had ever directed or encouraged him to engage in off-

label promotion or to direct or encourage the sales representatives under his supervision to do so.[99]

The undisputed facts thus demonstrate that Defendant Genzyme is entitled to summary

judgment on Plaintiff O'Donnell's *Greeley* claims.  O'Donnell himself admitted that from 2009,

Genzyme took a hard line against off-label promotion.  And although Genzyme raised sales targets

for 2013, the increase was uniform across all areas and accompanied restructured sales practices and

an increased sales force.  After receiving answers to his initial inquiries that were at most ambiguous

as to how the new higher numbers were supposed to be reached, O'Donnell did not seek further

clarification.  Nor did he try to meet the new goals.  Instead of trying to succeed without promoting

off-label,[100] he "assumed the worst" and "jump[ed] to conclusions too fast."

In short, even considering the 2013 sales quota in combination with the other factors

---

[97]*See Mauzy v. Kelly Servs., Inc.*, 664 N.E.2d 1272, 1281 (Ohio 1996) ("Instead, a myriad of factors are considered, including reductions in sales territory, poor performance evaluations, criticism in front of coemployees, inquiries about retirement intentions, and expressions of a preference for employees outside the protected group.").

[98]Plaintiff O'Donnell points to his "successfully meets expectations" performance evaluations as supporting a finding of a constructive discharge.  But these evaluations were not failing and were received for several years without leading to termination.

[99]Rather, O'Donnell believes that at least one sales representative was fired for engaging in off-label promotion.  Doc. 45-4 at 175-76.

[100]*Cf. Zivkovic v. Juniper Networks, Inc.*, 450 F. Supp. 2d 815, 828 (N.D. Ohio 2006) (rejecting an Ohio state law claim of constructive discharge because, among other reasons, the plaintiff did not give his employer's company-wide restructuring of sales goals "a fair chance").

-17-

Case No. 1:14-CV-01767
Gwin, J.

O'Donnell relies on, no reasonable jury could conclude that a reasonable employee in O'Donnell's position would have felt that his working conditions were intolerable or that his termination was imminent.  It follows that no reasonable jury could conclude that O'Donnell was constructively discharged.  Because a discharge is a necessary element of a *Greeley* claim, Plaintiff O'Donnell's *Greeley* claims must therefore fail.

The Court will therefore **GRANT** Genzyme's motion to dismiss Counts 2 and 3 of Plaintiff O'Donnell's amended complaint.  The Court notes that Count 4 lists constructive discharge as a standalone basis for relief.  This count fails because, as Genzyme points out, constructive discharge is not a standalone theory of relief, but rather a method of proving a discharge forbidden by another source of law.  The Court will therefore also **GRANT** Genzyme's motion to dismiss Count 4 of Plaintiff O'Donnell's amended complaint.

### C. Section 4112 Retaliation Claim

Under Ohio's anti-discrimination statute, it is illegal "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section . . . ."[101]/  Employment discrimination on the basis of gender is one such "unlawful discriminatory practice."[102]/  Plaintiff O'Donnell alleges that Defendant Genzyme retaliated against him because he opposed gender discrimination when Kristin Kepreos was fired.  O'Donnell claims Genzyme retaliated by giving him a Final Written Warning.

Ohio law uses a burden-shifting framework to analyze § 4112 retaliation claims that rely on circumstantial rather than direct evidence.  First, the plaintiff must put forward a prima facie case

---

[101]Ohio Rev. Code § 4112.02(I).
[102]*See id.* § 4112.02(A).

-18-

Case No. 1:14-CV-01767
Gwin, J.

of retaliation.  If the plaintiff does so, the defendant then has the burden of producing a legitimate

nondiscriminatory reason for the action it took.  If the defendant meets this burden, the burden shifts

back to the plaintiff to demonstrate both that the asserted reason is pretextual and that retaliation was

the real reason for the action.[103]

A prima facie case of retaliation has four elements.  The first is that the defendant engaged

in protected activity.  The second is that the employer was aware of the protected activity.  The third

is that the employer took an adverse action against the employee.  And the fourth is that there is a

causal connection between the protected activity and the adverse action.[104]

An action is adverse for purposes of a § 4112 retaliation claim if "it well might have

'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[105]

For purposes of its summary judgment motion, Defendant Genzyme concedes that Plaintiff

O'Donnell engaged in protected activity by opposing what he believed to be gender

discrimination.[106]  Genzyme says, however, that the Final Written Warning was not an adverse

employment action and that even if it were, the individual who decided to issue it lacked any

knowledge of O'Donnell's opposition to gender discrimination.  Genzyme argues that there cannot

be any causal connection where the person making the challenged action did not know about the

protected activity.

Defendant Genzyme's argument that no reasonable jury could find that the Final Written

---

[103] *Smith v. Dep't of Pub. Safety*, 997 N.E.2d 597, 611-12 (Ohio Ct. App. 2013) (internal citations omitted).

[104] *Id.* at 611 (citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 6th Cir. 2007)).

[105] *Wallace v. Mantych Metalworking*, 937 N.E.2d 177, 186 (Ohio Ct. App. 2010) (quoting *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  The cases Genzyme cites for a more stringent definition of "adverse employment action" either deal with discrimination rather than retaliation or predate the Supreme Court's clarification of the proper standard in *Burlington Northern & Santa Fe Railway Co.*, or both.  *See* Doc. 55 at 11.

[106] Doc. 45-1 at 5.

-19-

Case No. 1:14-CV-01767
Gwin, J.

Warning was an adverse action fails.  As noted above, to show that an action was adverse for purposes of a retaliation claim, a plaintiff must show only that the action "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"[107/]  The Final Written Warning made O'Donnell ineligible to seek internal transfers or promotions.[108/]  It also subjected O'Donnell to "additional disciplinary action, up to and including termination" "[i]f at any point in the future [he] violate[d] company conduct, behavior or expectations."[109/]  A reasonable jury could conclude that these consequences "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

Genzyme next says that Rick Ramos imposed the Final Written Warning, and that Ramos was unaware of O'Donnell's protected activity when he made the decision.[110/]  In response, Plaintiff O'Donnell points out that the Final Written Warning was communicated in an email by Howard Thorpe, O'Donnell's supervisor and one of the individuals O'Donnell says he voiced his concerns about gender discrimination to.[111/]

Responding, Genzyme says that while Thorpe communicated the decision, Ramos made the decision without knowledge of O'Donnell's protesting.  And Genzyme says no evidence supports a finding that Ramos had any knowledge that O'Donnell protested Kepreos's firing.

This explanation is plausible, particularly in light of the fact that O'Donnell himself had been asked to tell Kepreos that she was being fired despite having no part in that decision.  Nonetheless, although the question is a close one, taking all inferences in favor of O'Donnell, the nonmoving

---

[107]*Wallace*, 937 N.E.2d at 186 (quoting *White*, 548 U.S. at 68).

[108]Doc. 45-13 at 2-3.

[109]Doc. 45-9 at 3.

[110]Doc. 45-13 at 2.

[111]Doc. 53-10.

-20-

Case No. 1:14-CV-01767
Gwin, J.

party, O'Donnell has put forward enough evidence that Thorpe made or played a sufficient role in making the decision to issue the Final Written Warning to create a genuine dispute of material fact.

Finally, the temporal proximity between the protected activity and the alleged retaliatory action–approximately one week–provides sufficient evidence of causal connection at the prima facie case stage.

Because Plaintiff O'Donnell offers sufficient evidence to establish a prima facie case of retaliation, the burden of production shifts to Defendant Genzyme to provide legitimate nonretaliatory reasons for the Final Written Warning.  Genzyme attempts to do this by relying on the Final Written Warning's stated justifications that O'Donnell failed to enforce compliance with regulatory requirements by sales representatives he supervised and that he failed "to Fulfill Essential Managerial Duties, Responsibilities and Expectations" by the manner in which he refused to terminate Kepreos.

In particular, Genzyme says that O'Donnell refused to read the company's reasons for firing Kepreos, that he failed to notify Lenes and Thorpe of his refusal to participate in firing Kepreos until ten minutes before the call, and that he avoided talking to Lenes earlier in the day.

Genzyme says it fired Kepreos because she submitted false claims for reimbursement that claimed she attended dinners with physicians when she had not actually attended the dinners. Kepreos's absence also meant that the dinners violated company compliance guidelines and the Code of Ethics of the Advanced Medical Technology Association because without Kepreos present, the dinners lacked an educational component.[112]

O'Donnell seems to recognize that Kepreos's behavior was improper.  But he seems to say

---

[112]*See* Doc. 45-10; Doc. 45-11 at 7-8.

Case No. 1:14-CV-01767
Gwin, J.

that males did the same thing without similar punishment.[113]

Regardless, Genzyme's asserted reasons for imposing the Final Written Warning are legitimate and nonretaliatory. Even if a manager suspects discrimination, failing to examine the company's reasons for its decisions and waiting until immediately before the time the firing is scheduled to refuse to participate can validly lead to discipline. The burden thus shifts back to Plaintiff O'Donnell to establish that these asserted reasons are actually pretext for retaliation.

O'Donnell attempts to show pretext with circumstantial evidence. In particular, O'Donnell points to "[s]uspicious timing," "[t]he absence of any discipline towards O'Donnell in the 13 years preceding his opposition and refusal to terminate Kepreos," and the conflict between the allegations leveled against O'Donnell in the Final Written Warning and the testimony of coworkers who found O'Donnell to be professional and honest.[114] These arguments fall short.

To begin, neither the absence of prior discipline nor the affidavits of O'Donnell's coworkers are of much importance. The mere fact that O'Donnell had not been disciplined in the past does not shed light on whether Genzyme's asserted reasons–which could well justify the action taken–were genuine. Likewise, the fact that coworkers had a high opinion of O'Donnell's integrity does not shed meaningful light on the genuineness of the asserted justifications for the warning.

The allegedly "suspicious timing" is somewhat stronger. In most cases, temporal proximity is evidence that other asserted reasons for the action are false. In this case, however, the protected activity and the legitimate nonretaliatory justification arose from the same event. Because the timing does not distinguish between the two explanations, it provides no evidence that Genzyme's

---

[113]Doc. 45-4 at 267-68.
[114]Doc. 53 at 15.

-22-

Case No. 1:14-CV-01767
Gwin, J.

explanations are pretextual.

Accordingly, no reasonable jury could conclude that Plaintiff O'Donnell satisfied his burden to show that Defendant Genzyme's explanations were pretextual and that the real reason for the Final Written Warning was unlawful retaliation.  The Court will therefore **GRANT** Genzyme's motion to dismiss Count 1 of Plaintiff O'Donnell's amended complaint.

### III. Motion to Strike

In addition to seeking summary judgment, Defendant Genzyme requests that certain documents and portions of documents filed by Plaintiff O'Donnell be stricken from the record.[115/] In particular, Genzyme seeks to strike (1) material that Genzyme says is attorney-client privileged; (2) the response to summary judgment filed on February 17, 2015, to the degree it differs from the version Plaintiff sought leave to file instanter on February 13, 2015; and (3) technically defective declarations attached to Plaintiff's opposition to summary judgment.

Genzyme is correct that material in Plaintiff's O'Donnell's opposition to the summary judgment motion is virtually identical to material the Court has already deemed attorney-client privileged[116/] and ordered stricken from O'Donnell's complaint and amended complaint.[117/]  The Court therefore **GRANTS** Genzyme's motion to strike the two sentences on page 6 of O'Donnell's response to summary judgment beginning "When asked" and the corresponding portions of Plaintiff O'Donnell's declaration.[118/]

As to Genzyme's request to strike Plaintiff O'Donnell's opposition to summary judgment,

---

[115]Doc. 55 at 4-5; Doc. 56.

[116]*Compare* Doc. 17 at 9, *with* Doc. 53 at 6.

[117]*See* Doc. 33 at 14.

[118]Plaintiff O'Donnell's contention that these two sentences are not virtually identical to previously stricken statements is simply incorrect.

-23-

Case No. 1:14-CV-01767
Gwin, J.

Genzyme notes that this filing was due on February 12, 2015.[119]  At approximately 4:00 AM on February 13, 2015, Plaintiff O'Donnell filed a "motion for leave to file instanter, four hours out of time, his opposition to Defendants' motion for summary judgment."[120]  Genzyme did not object. By marginal order on February 17, 2015, the Court granted Plaintiffs' motion and directed Plaintiff "to file said opposition upon receipt of this Order."

Later on February 17, 2015, Plaintiff O'Donnell filed an opposition to summary judgment.[121] But this opposition contained substantive differences from the version attached to the motion for leave to file instanter.  Likewise, the declarations attached to the newer version of the summary judgment opposition differed substantively from those attached to the instanter version.

The Court finds this behavior troubling.  Without notifying the Court or Genzyme of the changes and without receiving leave to file an amended opposition, Plaintiff O'Donnell filed different documents than those that the Court had approved for slightly late filing.  As a result, Genzyme was left with only minimal time before the deadline to submit its reply brief to address the changes.  Nonetheless, because the Court has concluded that summary judgment is appropriate on all counts regardless of which opposition is considered,[122] and because no privilege issue is at stake, the Court **DENIES AS MOOT** Genzyme's motion to strike the February 17, 2015, opposition to summary judgment.[123]

---

[119]*See* Doc. 48.

[120]Doc. 50.

[121]Doc. 53.

[122]For this reason, this order cites to the more recent version of Plaintiff O'Donnell's opposition to Genzyme's summary judgment motion throughout.

[123]Plaintiff O'Donnell responds that nothing in the Court's order or the Federal Rules of Civil Procedure required that the two responses be identical and notes that the Court does not accept instanter filings.  *See* Doc. 58 at 4-5.  Even if no provision specifically so required, the filing with changes clearly violated the spirit of the Court's order.  And although it is true that the Court does not accept instanter filings, Genzyme reasonably began preparing

(continued...)

Case No. 1:14-CV-01767
Gwin, J.

For similar reasons, the Court **DENIES AS MOOT** Genzyme's motion to strike declarations by Adam Hauben and others because the versions attached to one or both of the versions of the summary judgment opposition were unsigned or undated.[124/]

### IV. Conclusion

For the reasons above, the Court **GRANTS** Defendant Genzyme's motion to dismiss all counts of O'Donnell's amended complaint, **GRANTS** Genzyme's motion to strike certain attorney-client privileged communications, and **DENIES AS MOOT** the remainder of Genzyme's motion to strike and Plaintiff O'Donnell's motion for leave to amend various declarations.

IT IS SO ORDERED.


Dated: March 11, 2015                              s/          *James S. Gwin*
                                                   JAMES S. GWIN
                                                   UNITED STATES DISTRICT JUDGE

---

[123](...continued)
its reply based on the instanter response to summary judgment.  The proper method of filing a different version of the summary judgment response would have been to file a motion for leave to amend or supplement.

[124]The Court thus also **DENIES AS MOOT** Plaintiff O'Donnell's motion for leave to file declarations amended to include signatures and dates.  *See* Doc. 57.